1

2

3

4

5

6                       **UNITED STATES DISTRICT COURT**
                              **DISTRICT OF NEVADA**
7

8    PHILLIP B. ASHDOWN,              )        3:11-cv-00832-LRH-WGC
                                      )
9              Plaintiff,             )        **REPORT AND RECOMMENDATION**
                                      )        **OF U.S. MAGISTRATE JUDGE**
10       vs.                          )
                                      )
11   PRISON HEALTH SERVICES, et. al.  )
                                      )
12             Defendants.            )
                                      )
13   _____ )

14        This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior

15   United States District Judge. The action was referred to the undersigned Magistrate Judge

16   pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the

17   court is Defendants' Motion for Summary Judgment. (Doc. # 155.)[1] Plaintiff has opposed the

18   motion (Doc. # 194) and Defendants filed a reply (Doc. # 206).

19        Also before the court is Plaintiff's Cross-Motion for Summary Judgment. (Doc. # 196.)[2]

20   Defendants opposed (Doc. # 207) and Plaintiff filed a reply (Doc. # 208).

21        After a thorough review, the court recommends that Plaintiff's motion be denied and

22   that Defendants' motion be granted in part and denied in part.

23                              **I. BACKGROUND**

24        At all relevant times, Plaintiff Phillip B. Ashdown was an inmate in custody of the

25

26   _____

27        [1] Refers to court's docket number.

28        [2]This document is identical to Plaintiff's opposition (Doc. # 194) but was docketed separately by the
     Clerk's Office.

1   Nevada Department of Corrections (NDOC). (Pl.'s Compl., Doc. # 11 at 1.)[3] The events giving

2   rise to this action took place while Plaintiff was housed at various NDOC facilities. (*Id.*)

3   Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) Defendants are

4   Dr. Robert Bannister, Dr. Karen Gedney, Dr. Marsha Johns, Dr. David Mar, Kathy King, Jack

5   Palmer, John Peery, Jonathan Perry, Veronica VanHorn and Elizabeth Walsh.

6          The only remaining claim centers on Plaintiff's allegation that Defendants were

7   deliberately indifferent to his serious medical needs related to care he has received with respect

8   to his leg braces in violation of the Eighth Amendment. (*See* Docs. # 108 at 10, # 136.)

9   Specifically, Plaintiff alleges that he has been "deprived of promised proper repair and use of

10  his required leg braces." (Doc. # 11 at 6; *seel also* Doc. # 11 at 8, 12, 17.)

11         Defendants move for summary judgment, arguing there is no evidence any defendant

12  acted with deliberate indifference, and instead NDOC consistently acted to accommodate

13  Plaintiff's medical needs related to walking assistance. (Doc. # 155 at 9.) Defendants do not

14  dispute that Plaintiff's leg braces broke on several occasions; however, they contend NDOC

15  acted to have repairs done or new braces made when it became apparent the old braces were

16  not holding up. (*Id.*) In addition, they claim Plaintiff was provided shoes to accommodate his

17  braces and orthotics, adjustments were made to his braces on several occasions by NDOC's

18  contractor, OrthoPro, and he was given a cane when necessary. (*Id.*)

19         Defendants also argue that any claim for damages against a defendant in his or her

20  official capacity must be dismissed. (Doc. # 155 at 10.)

21         Finally, Defendants contend that defendants Perry and Walsh must be dismissed as they

22  are not implicated in the surviving claim. (*Id.* at 10-11.)

23         Plaintiff opposes Defendants' motion and has filed a cross-motion for summary

24  judgment. (Docs. # 194/196.) He argues that he did not receive adequate care with respect to

25  his leg braces and that they were in a constant state of disrepair throughout his time at NDOC.

26  _____

27         [3]The court has been informed that since the briefing on these motions was completed, Plaintiff has been released from prison.

28                                                      2

1  Plaintiff contends that the new leg braces made for him were not any better, and that his near

2  constant requests for assistance in getting the old braces repaired or adjustments to the new

3  braces were met with an ineffective and unsatisfactory response.  He asserts that a genuine

4  dispute as to various material facts exists so as to preclude the entry of summary judgment in

5  favor of Defendants.

6  ## II. LEGAL STANDARD

7       "The purpose of summary judgment is to avoid unnecessary trials when there is no

8  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

9  18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in

10  favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing

11  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate

12  if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

13  there is no genuine issue as to any material fact and that the movant is entitled to judgment as

14  a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)).[1] Where reasonable minds could differ on the

15  material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S.

16  at 250.

17       The moving party bears the burden of informing the court of the basis for its motion,

18  together with evidence demonstrating the absence of any genuine issue of material fact.

19  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence

20  in an inadmissible form, only evidence which might be admissible at trial may be considered

21  by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

22       In evaluating the appropriateness of summary judgment, three steps are necessary:

23   (1) determining whether a fact is material; (2) determining whether there is a genuine issue

24  for the trier of fact, as determined by the documents submitted to the court; and (3)

25

26  [1]Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary judgment if

27  the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

28                                                    3

considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations. ///

4

1

**III. DISCUSSION**

2

**A. Preliminary Matters**

3

**1. Reference to Dismissed Claims**

4      Plaintiff's opposition/cross-motion and reply briefs contain numerous references and

5   argument pertaining to claims that have been dismissed from this action. (*See, e.g.*, Docs. #

6   194/196 at 2-4, 8, 17, 19, 22, 26-27, 34-36, 38, 40, 44, 48-49; Doc. # 208 at 7, 9, 13, 17, 27, 29.)

7   Plaintiff's claims related to the denial of medication, pain management, his neurological

8   disorder, retaliation, and a fall that occurred on October 16, 2010[2], are not a part of this action.

9   Plaintiff's medical malpractice action was also dismissed from this case. As such, the court will

10  not consider the arguments advanced by Plaintiff as to dismissed claims.

11

**2. Reassertion of Rule 56(f) Argument**

12      Plaintiff also attempts to rehash his argument that he should be entitled to more time

13  to oppose Defendants' motion under Federal Rule of Civil Procedure 56(d).

14  (*See* Docs. # 194/196 at 6-7.) The court has already considered and rejected this argument.

15  (*See* Doc. # 204.) The court will not reconsider its determination at this juncture.

16      As the court stated in its order addressing this topic, Plaintiff has had ample time to

17  review his files and obtain information from his personal files. Moreover, the court gave

18  Plaintiff an extension of time to prepare his response to Defendants' motion, and then an

19  additional extension of time to file a supplemental response. To the extent Plaintiff asserts that

20  he should be given more time to conduct discovery, the court reiterates that Plaintiff failed to

21  timely and properly propound discovery in this action. (*See* Doc. # 204.) Finally, Plaintiff has

22  again failed to demonstrate  how additional time or the additional review of materials would

23  allow him to raise a genuine dispute as to any material fact in opposition to Defendants'

24  motion.

25

26      [2]The court will not consider Plaintiff's claim for deliberate indifference related to the October 16, 2010
    fall; however, to the extent Plaintiff references this fall as evidence of injury he suffered as a result of the alleged

27  deliberate indifference related to the failure to provide properly functioning leg braces, the court will consider this
    information in this limited capacity.

28

5

1   In sum, to the extent Plaintiff's brief can be viewed as raising another request for an

2   extension of time or continuance to respond to Defendants' motion for summary judgment,

3   that request should be denied.

4   **B. Eighth Amendment Deliberate Indifference to Serious Medical Need**

5   A prisoner can establish an Eighth Amendment violation arising from deficient medical

6   care if he can prove that prison officials were deliberately indifferent to a serious medical need.

7   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less

8   stringent in cases involving a prisoner's medical needs than in other cases involving harm to

9   incarcerated individuals because '[t]he State's responsibility to provide inmates with medical

10  care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*,

11  974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104

12  F.3d. 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an

13  inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors

14  or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

15  A finding of deliberate indifference involves the examination of two elements: "the

16  seriousness of the prisoner's medical need and the nature of the defendant's responses to that

17  need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir.

18  2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need

19  exists if the failure to treat a prisoner's condition could result in further significant injury or

20  the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*,

21  429 U.S. at 104); *Akhtar*, 698 F.3d at 1213 ("First, the plaintiff must show a serious medical

22  need by demonstrating that failure to treat a prisoner's condition could result in further

23  significant injury or the unnecessary and wanton infliction of pain."). Examples of conditions

24  that are "serious" in nature include "an injury that a reasonable doctor or patient would find

25  important and worthy of comment or treatment; the presence of a medical condition that

26  significantly affects an individual's daily activities; or the existence of chronic and substantial

27  pain." *Id.* at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting

28  

6

1  *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several

2  months demonstrated a serious medical need).

3      If the medical needs are serious, Plaintiff must show that Defendants acted with

4  deliberate indifference to those needs. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213

5  (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v.*

6  *Chung*, 391 F.3d 1051, 1060 (9th Cir.  2004). Deliberate indifference entails something more

7  than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient

8  to establish a cause of action under § 1983.  *McGuckin*, 974 F.2d at 1060. Instead, deliberate

9  indifference is only present when a prison official "knows of and disregards an excessive risk

10  to inmate health or safety; the official must both be aware of the facts which the inference could

11  be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

12  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*,

13  439 F.3d at 1096) (This second prong…is satisfied by showing (a) a purposeful act or failure to

14  respond to a prisoner's pain or possible medical need and (b) harm caused by the

15  indifference."); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511

16  U.S. at 858).

17      "Prison officials are deliberately indifferent to a prisoner's serious medical needs when

18  they deny, delay, or intentionally interfere with medical treatment" or the express orders of a

19  prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865

20  F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). In addition, it

21  "may be shown by the way in which prison officials provide medical care." *Crowley v.*

22  *Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th

23  Cir. 2006), *overruled on other grounds by WMX Techs, Inc. v. Miller*, 104 F.3d 1133 (9th Cir.

24  1997) (en banc) (internal quotation marks omitted)). Where delay in receiving medical

25  treatment is alleged, a prisoner must demonstrate that the delay led to further injury.

26  *McGuckin*, 974 F.2d at 1060.

27      Finally, a "difference of opinion between a physician and the prisoner—or between

28

medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference," unless the inmate can show that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citations omitted).

**C. Analysis**

**1. Preliminary Comments**

Defendants do not dispute Plaintiff suffers from a serious medical need. Instead, they contend that their response to this need does not amount to deliberate indifference.

As will be set forth in detail below, the court finds that Defendants have not established that there is no genuine dispute as to any material fact such that they are entitled to summary judgment as a matter of law. Instead, the court finds that the evidence provided by Defendants, as well as that provided by Plaintiff, establishes a genuine dispute of material fact as to whether Defendants were deliberately indifferent to Plaintiff's serious medical need. Insofar as Plaintiff's claim can be construed as a "difference of opinion" between Plaintiff and his medical providers, the court finds that questions of fact exist as to whether Defendants' response was "medically unacceptable" under the circumstances and whether it was "in conscious disregard of a serious risk" to Plaintiff's health.

The court concludes that Plaintiff's motion for summary judgment should likewise be denied because while Plaintiff requests for summary judgment be granted in his favor, his brief is focused on pointing out that a genuine dispute as to various material facts *does* exist as to whether he received adequate medical care concerning his leg braces. (*See* Docs. # 194/196 at 4, 5, 25; *see also* Doc. # 208 at 5, 12.)

Plaintiff bears the burden of proof at trial on his Eighth Amendment claim. Therefore, as the party moving for summary judgment, it is his initial burden to show "the *absence* of a genuine issue of fact on each issue material to [his] case. *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480 (citations omitted)(emphasis added). Here, Plaintiff goes through each contention

Defendants' have raised in their own motion and points out how he perceives there to be a dispute of fact. He has *not* established the *absence* of a genuine dispute of material fact. Moreover, as the court will point out below, there are various disputes concerning material facts which preclude the entry of summary judgment in either party's favor.

There is no dispute that Plaintiff suffers from bilateral foot drop associated with hereditary spastic paralysis. Nor is there a dispute that this condition required Plaintiff to utilize prosthetic leg braces, orthotic inserts and specialized footwear. In fact, Defendants do not dispute that Plaintiff's leg braces were broken, and state that NDOC ordered him new braces "when it became apparent that the old leg braces were holding up well." (Doc. # 155 at 9:20-22.) At issue, then, is whether the Defendants' response to Plaintiff's complaints regarding his leg braces—either the need for repairs to the old braces or issues with adjustment and fit of the new braces—rises to the level of deliberate indifference.

The Defendants argue that they consistently acted to accommodate Plaintiff's need for assistance in walking and made arrangements for his old braces to be repaired and for new braces to be made. Plaintiff contends that despite filing nearly-constant complaints about maladjusted and improperly functioning old braces and similar gripes regarding the new braces and resulting pain he was suffering as a result of both from 2009 through 2013, the braces—old or new—never adequately functioned.

**2. Medical Evidence**

  **a. 2009**

The parties agree that when Plaintiff came to NDOC from the Washoe County Jail in the summer of 2009, he was not permitted to bring his leg braces with him, so his family took possession of the braces.

Initially, there is some dispute as to when Plaintiff was first seen by Dr. Gedney after arriving to NDOC's Northern Nevada Correctional Center (NNCC). Defendants contend Plaintiff was transferred to NNCC and evaluated by Dr. Gedney on August 20, 2009. (Doc. # 155 at 3; Doc. # 156-1 at 35.) At that time, Defendants assert that Dr. Gedney

9

1   determined Plaintiff needed prosthetics because he suffered from bilateral foot drop associated

2   with hereditary spastic paralysis. (*Id.*) She then ordered that Plaintiff see a technician from the

3   prison's contracted orthotic and prosthesis provider, OrthoPro. (*Id.*; Doc. # 156-2 at 24.) An

4   August 18, 2009 medical order does note Plaintiff's condition, that he came in with special

5   footwear and inserts, and should be permitted to keep them. (Docs. # 194-1/196-1 at 28.)

6        Plaintiff, on the other hand, contends he was first seen by Dr. Gedney on intake at NNCC

7   in July 2009, and his medical records at that time indicated he wore special footwear and leg

8   braces. (Docs. # 194/196 at 14.) Plaintiff also disputes that Dr. Gedney recommended that he

9   be able to obtain the leg braces, arguing that he was the one that demanded their provision.

10  (Docs. # 194/196 at 8.)

11       Regardless of whether Plaintiff was first seen by Dr. Gedney in July or August of 2009,

12  it was evident from the time Plaintiff came to NDOC that he had a condition which required

13  leg braces.

14       Next, Defendants point to an entry in Plaintiff's medical records dated August 26, 2009,

15  and claim that Plaintiff was seen by OrthoPro on that date. (Doc. # 156-1 at 34.) This entry

16  contains a notation that Plaintiff had leg braces in July 2009, but was not allowed to bring

17  them with him to NNCC; instead, they were sent home with his mother. (*Id.*) The entry states

18  that Plaintiff was advised to contact his mother and have his old braces sent in to see if they

19  would still fit. (*Id.*)

20       Plaintiff disputes that he was seen by OrthoPro on this date. (Docs. # 194/196 at 20.)

21  While a note exists that Plaintiff should advise his mother to send the braces in, Plaintiff claims

22  he was not given authorization for this action from NDOC until more than two months later,

23  on November 6, 2009. (Doc. # 156-1 at 30.) The November 6, 2009 progress note entry in

24  Plaintiff's medical records indicates that on that date Plaintiff's mother was contacted by NDOC

25  and given instructions on how to send in the braces. (Doc. # 156-1 at 30.)

26       According to NDOC's records, Plaintiff was transferred to Warm Springs Correctional

27  Center (WSCC) the following day. (Doc. # 155-5 at 11.)

28                                                  10

A progress note dated September 2, 2009, states that a voice mail message was left for John Peery (nurse at NNCC) regarding Plaintiff's special footwear and inserts which were taken at NNCC and not returned. (Doc. # 156-1 at 34.) It was also noted that Plaintiff had a written order from Dr. Gedney for the footwear. (*Id*.) Plaintiff submitted a grievance dated September 8, 2009, where he complains about his special footwear not being sent to him. (Docs. # 194-1/196-1 at 29.)

Defendants claim that Plaintiff was next seen in a pulmonary clinic on September 17, 2009. (Doc. # 155 at 3:18-20, citing Ex. D (Doc. # 156-4 at 2).) Defendants state that when he was seen in the clinic, "he was wearing orthotics." (Doc. # 155 at 3:19-20, citing Ex. D.) This is apparently an argument in response to Plaintiff's prior kite that his special footwear were not sent to him as of September 8, 2009. Exhibit D contains the record from Plaintiff's visit to the pulmonary clinic, but it is dated September 17, 2010. (Doc. # 156-4 at 2.) In addition, while the document does reference leg braces (without any detail), as far as the court can tell, it does not state that Plaintiff was wearing orthotics. (*Id*.)

According to Defendants, Plaintiff was seen next by Dr. Mar on October 20, 2009. (Doc. # 155 at 3:21-23.) Defendants assert at that time Plaintiff reported problems with his *orthotics* and indicated that he had been seen by a technician from OrthoPro for the problems. (*Id*.) They contend that after the appointment, Dr. Mar called Dr. Gedney to check on the status of the *orthotics* and was advised Ortho-Pro was working on them. (*Id*. at 3:24-25.) Dr. Mar then called to follow up, but the OrthoPro technician had called in sick that day. (*Id*. at 3:25-26.)

A review of the actual progress note reveals that it is by and large illegible. In addition, Plaintiff disputes that he saw Dr. Mar that date. (Docs. # 194/196 at 20.) Moreover, there is no evidence that the issue of Plaintiff's *leg braces* (as opposed to orthotics) was addressed at that visit, if it occurred.

As indicated above, Plaintiff's records reflect that the warden gave approval for Plaintiff's mother to send in the leg braces, and she was contacted and given instructions on how to send the braces to WSCC on November 6, 2009. (Doc. # 156-1 at 30.)

11

Plaintiff claims that he received the braces when his mother sent them in, and tried to be seen by OrthoPro at WSCC (as opposed to just sending the braces to NNCC), but the prison staff would allow the *braces only* to be sent to NNCC. (Docs. # 194/196 at 21, 23.) Defendants appear to acknowledge that once the braces were sent in by Plaintiff's mother, they were sent to OrthoPro (without Plaintiff) for evaluation. (Doc. # 155 at 4:6-8.)

A December 15, 2009 progress note states that there was a plan in place to consult the OrthoPro technician regarding the leg braces. (Doc. # 156-1 at 29.) This is reiterated in the physicians' orders. (Doc. # 156-2 at 21.) A document with the same date with OrthoPro's letterhead on it states that Plaintiff's brace was brought in for evaluation of working condition. (Doc. # 156-3 at 14.) It was noted that the "plastic ha[d] 'stress marks' around the ankle joints" and that "the [illegible] Assist [illegible] are working fine" and "[a] slight adjustment was made to the Dorsal lift of the [left] to increase strength." (*Id*.) There was also a notation to follow up. (*Id*.) Defendants interpret this document as stating that "the braces appeared to be 'working fine.'" (Doc. # 155 at 4:8-9.) It is not clear to the court, however, that this was what was being conveyed by OrthoPro. Instead, it appears that this document states that one *part* of the braces was working fine, although it noted other problems, but the document itself is not conclusive on this issue.

Moreover, Plaintiff disputes that the braces were "working fine." He asserts that when he received the braces back from OrthoPro from being repaired, they were not functioning properly. (Docs. # 194/196 at 21.) He claims they still did not have a proper lift and were digging into his ankle. (*Id*.) This is supported by Plaintiff's records, which indicate that on December 23, 2009, he went to medical and asked for glue and a screwdriver to repair and adjust his braces. (Doc. # 156-1 at 28-29.) Plaintiff was told they did not have those items, and he then asked when the braces would be sent out for repair. (*Id*. at 28.) The nurse said she did not know, but thought it had already been done. (*Id*.) Plaintiff responded that it had not. (*Id*.) He requested that the nurse talk to someone else to get more information. (*Id*.) The nurse noted that she had the health information coordinator discuss this with Plaintiff. (*Id*.) She then

noted: "apparently they were repaired where needed" (*id*.), despite the fact Plaintiff had just claimed they were not. She then noted that Plaintiff got upset, raised his voice and was asked to calm down or leave. (*Id*.)

### ii. 2010

Plaintiff filed a grievance dated January 7, 2010, where he asked for assistance in getting his leg braces repaired. (Docs. # 194-1/196-1 at 32-42.) He relayed that he had sent three requests to medical to see the OrthoPro technician at NNCC for adjustment, but had not received a response. (*Id*. at 33-34.) He then indicated that his leg braces needed to be sent in because they were digging into his leg and causing so much pain that he could not wear them. (*Id*. at 34.) He also reiterated that he needed to go with the braces to NNCC so they could be fitted and adjusted properly, and so the springs could be fixed. (*Id*. at 35.) He informed NDOC that he had been advised that the braces had been repaired, but that was not the case. (*Id*.) In response to his informal level grievance he was told that he was being scheduled to see Rand at NNCC regarding the braces and would see Dr. Mar the following week. (*Id*. at 32.)

Plaintiff then filed a first level grievance, stating that he had been waiting for two and a half months to get his leg braces adjusted. (*Id*. at 32.) In response, he was told that the grievance was being sent to NNCC medical for a response. (*Id*.)

In his second level grievance, Plaintiff again stated that the braces had not been repaired or adjusted. (*Id*. at 40.) He complained that they were completely ineffective and causing him severe pain. (*Id*. at 41.) Finally, he stated that until he received the new braces, all he had were his worn-out shoe inserts that needed to be replaced. (*Id*.) In response, Plaintiff was told that the braces had been brought in and it appeared some minor adjustments had been performed and they "should be OK for the time being. It appears you will eventually, in your next sentence need another set of braces made…" (*Id*. at 32.)

While Plaintiff initiated this grievance in January of 2010, the document containing the responses indicates that the second level grievance response was not returned to Plaintiff until August 2010. (*Id*.)

13

Moreover, Plaintiff obviously disputes that the braces were "OK for the time being." He had just reported that they were broken and causing him extreme pain. In addition, he continued to complain about the condition of the braces after they were returned to him.

Plaintiff complained of pain again on January 19, 2010 (Doc. # 156-1 at 28), and while he was prescribed Tylenol until he could be seen by a doctor, Plaintiff elaborates that during this time his braces were maladjusted and broken and causing him a great deal of pain, indicating that a prescription of Tylenol was insufficient to remedy his problem.

Defendants contend that on January 26, 2010, defendant VanHorn referred Plaintiff to OrthoPro again, but in response to the referral another nurse noted Plaintiff had already been seen by OrthoPro and the referral was withdrawn. (Doc. # 155 at 4:21-24.) Defendants rely on Exhibit C at page 12 (set forth at Doc. # 156-1 at 28 in the court's docket). While this document reflects a referral to Rand at NNCC for adjustment of leg braces, and there is a note stating "was seen per Rand Kearns @ NNCC" that is initialed and dated 2/11/10, it is not clear from this document alone that the referral was withdrawn in the manner Defendants suggest.

Regardless, it does not appear Plaintiff was not seen by Rand at NNCC or OrthoPro for adjustment. This is evidenced by the fact that Plaintiff sent a kite on February 4, 2010, asking for a meeting to resolve issues related to his leg braces. (Docs. # 194-3/196-3 at 30.) Plaintiff contends he never received a response to this request. (*Id*.) He was then apparently transferred to Lovelock Correctional Center (LCC) for a period of time, and while he was there he also reported to the medical department that he still needed properly fitting leg braces. (Doc. # 156-1 at 26.) The provider at LCC agreed that the braces were ill-fitting and stated that he should be referred to OrthoPro. (*Id*.; Doc. # 156-2 at 19.)

In fact, on March 2, 2010, Dr. Scott and Don Poag sent a referral to OrthoPro regarding a maladjusted right calf leg brace that was impinging and braces that had both lost their spring action. (Doc. # 156-3 at 12.) The referral stated: "The brace is obviously poor fitted for this man's calf/ankle." (*Id*.) Defendants' concede that this request remained pending when Plaintiff inquired again on March 21, 2010. (Doc. # 155 at 4:28-5:1.)

Plaintiff asserts that he sent a kite on April 17, 2010 asking to be seen by an OrthoPro technician to have his leg braces adjusted and repaired, but received no response. (Docs. # 194-3/196-3 at 33.) He sent two more similar kites on April 20, 2010 and April 27, 2010, but contends he received no meaningful assistance. (*Id*. at 34-36.) Plaintiff continued to kite about this issue in May, sending kites on May 5, and 7, but claims he was never seen in response to his requests. (*Id*. at 37-38.)

A May 26, 2010 memorandum to the Utilization Review Committee by Don Poag, resubmitting a repair estimate for Plaintiff's prosthetics, because there was "an obvious discrepancy in the lengths of the braces" and stated that "[t]he spring action is also less than satisfactory." (Doc. # 156-3 at 11.) It also stated: "I would strongly suggest that the inmate be present when Ortho-Pro looks at the prosthetics in order to facilitate proper fit and function." (*Id*.)

So as of May 26, 2010, a few months shy of a year after this issue had first raised by Plaintiff, he claims he still did not have properly functioning leg braces.

On June 10, 2010, Plaintiff was sent to WSCC. (Doc. # 155-5 at 10.) Defendants acknowledge that the issue regarding his leg braces remained unresolved at this point. (Doc. # 155 at 5.) Defendants also acknowledge that the physician at WSCC ordered that Plaintiff should either be sent to NNCC to have the braces fixed by OrthoPro or that OrthoPro should be scheduled to see the inmate at WSCC. (Doc. # 155 at 5:4-5.) Defendants imply that the same physician had previously said the braces were "working fine"; however, this appears to be in dispute. (Doc. # 155 at 6-7, citing Exhibit B at 19, 21 (Doc. # 156-2 at 20, 22).) Moreover, Plaintiff certainly takes issue with the statement that the leg braces were "working fine" at this point. Defendants also mention that Plaintiff had orthotics to wear at this point (Doc. # 155 at 5:3), but it is not clear where they get this information. Nor is it clear that this was sufficient to assist Plaintiff with his medical issue in the absence of properly functioning leg braces.

Plaintiff sent another kite requesting repair of his leg braces on June 18, 2010, noting that he had been trying to get them fixed since 2009. (Docs. # 194-3/196-3 at 73.) He also

15

submits a copy of a letter he claims to have written to Dr. Gedney, Dr. Bannister, and OrthoPro on June 22, 2010. (Docs. # 194-3/196-3 at 41-43.) In the letter, he indicated that he had been requesting repair of his braces since 2009, that the braces were still not fixed and he was still in pain as a result. (*Id*.) He claims he never received a response to this letter. (*Id*.)

Plaintiff sent another kite on June 24, 2010, asking to be transferred to NNCC to have his braces repaired. (Docs. # 194-3/196-3 at 44.) A physician's order dated June 29, 2010 from Dr. Scott was explicit: "Either transfer I/M to NNCC to have braces fixed by OrthoPro OR schedule him to be seen by OrthoPro to have brace issue resolved. (Doc. # 156-2 at 17.)

Plaintiff was transferred to NNCC on July 8, 2010. (Doc. # 155-5 at 10.) A progress note the following day indicates that Plaintiff had requested adjustments to his leg braces. (Doc. # 156-1 at 23.) Notwithstanding Plaintiff's transfer, the issue with the leg braces apparently persisted. In a July 17, 2010 kite, Plaintiff stated he was transferred to NNCC from WSCC for leg brace repair but had yet to be seen. (Docs. # 194-4/196-4 at 1.)

It seems that at this point, NDOC considered getting Plaintiff new leg braces. (*See* July 15, 2010 estimate from OrthoPro related to (new) braces at Doc. # 156-3 at 10.) Plaintiff claims that this request was not approved until July 27, 2010, and he did not receive the new braces until November 2010. (Docs. # 194/196 at 29.) During that time, he claims he was forced to use the improperly repaired old braces. (*Id*.) Even when the new braces arrived, Plaintiff claims they did not fit properly and caused him pain as well. (*See* Docs. # 194/196 at 29; Doc. # 156-3 at 9; Doc. # 156-1 at 21-22.)

As of August 30, 2010, the new braces had still not arrived. (Doc. # 156-3 at 9.) It was noted that the braces had been approved on July 27, 2010, and the person writing the note indicated they would check on the status. (*Id*.)

The braces had yet to be received as of September 15, 2010. (Doc. # 156-1 at 22.) Defendants assert Plaintiff was evaluated by Dr. Johns on this date. (Doc. # 155 at 5:19.) They state that she noted he was provided with diabetic shoes that accommodated the orthotics he was wearing while his old braces were being repaired. (*Id*. at 5:20-21.) According to

Defendants, Dr. Johns noted that Plaintiff was ambulating well and without difficulty, but acknowledged he would move better in spring loaded shoes. (*Id*. at 5:21-23.) She also said that the OrthoPro technician offered to pad the orthotics Plaintiff was wearing but he declined. (*Id*. at 5:23-24.)

Again, this progress note is mostly illegible. (Doc. # 156-1 at 22.) Moreover, Plaintiff disputes that he even saw Dr. Johns. (Docs. # 194/196 at 30-31.) He says that he always refused any appointment with Dr. Johns, and never saw her regarding his leg braces. (*Id*. at 31.) He claims that in any event Dr. Johns' note that Plaintiff was provided with shoes that accommodated his orthotics was false because the orthotics were with the new braces which he did not yet have. (*Id*.) He also disagrees that he refused to have padding put in the new braces. (*Id*.)

The molds for Plaintiff's new braces were cast on September 28, 2010. (Doc. # 156-1 at 21.) Plaintiff claims this was supposed to have been done in August. (Docs. # 194/196 at 31-32.)

Plaintiff kited again in November about the status of the new braces, and apparently received them on November 30, 2010, and it was noted Plaintiff was given instructions on how to break them in. (Doc. # 156-1 at 20.) However, on December 1, 2010, he sent a request to have the OrthoPro technician come back to adjust the new braces because they were "rubbing his skin raw." (Docs. # 194-4/196-4 at 9.) As such, Plaintiff contends there was no way for these braces to be "broken in." (Docs. # 194/196 at 32.)

### iii. 2011

Plaintiff was transferred to a minimum custody facility, Northern Nevada Restitution Center (NNRC), on February 23, 2011, and during the time he was there, until June 14, 2011, there are no entries in his progress notes. (Doc. # 156-1 at 16-17.)

Plaintiff complained about his leg braces again on September 14, 2011. (Doc. # 156-1 at 14.) Plaintiff was told he was scheduled for an appointment on October 7, 2011, but he contends he was denied access to the doctor. (Docs. # 194-2/196-2 at 17.) Plaintiff sent another kite to Dr. Gedney on October 24, 2011, stating he was supposed to be seen earlier that month but was

not seen. (*Id*. at 19.) In response he was told he would be scheduled. (*Id*.) Plaintiff sent another kite two days later, asking for his leg braces to be repaired. (Doc. # 156-5 at 5; Docs. # 194-2/196-2 at 20.)

Defendants contend Plaintiff was seen on November 2, 2011. (Doc. # 155 at 6:23.) They claim that Plaintiff told the doctor that the new leg braces caused him pain so he was wearing the old leg braces, but the springs did not work. (*Id*. at 6:23-25.) They state that the doctor submitted a request to OrthoPro asking whether the springs in the old braces could be replaced because Plaintiff preferred the old braces. (*Id*. at 6:25-27.) This progress note is also largely illegible. (Doc. # 156-1 at 13.) A review of the request sent to OrthoPro, which is also difficult to decipher, seems to indicate that the new braces were causing pressure and Plaintiff had the old braces, but the springs were broken. (Doc. # 156-3 at 8.) Plaintiff disputes that he said he preferred the new braces to the old braces. Instead, he contends he could not wear the new braces for more than five minutes before he was in excruciating pain and was forced to remove them, soaked in blood. (Docs. # 194/196 at 32.) Therefore, he claims his only choice was to wear the other braces.

Defendants contend Plaintiff was scheduled to be seen by OrthoPro on November 15, 2011, but did not show up. (Doc. # 155 at 6:27-28-7:1.) The progress note of that date does state that Plaintiff did not show up to his appointment. (Doc. # 156-1 at 12.) Plaintiff, however, maintains that he was never advised of the appointment and was never paged. (Docs. # 194/196 at 40.) Plaintiff points out that he sent a kite that same day asking when he would have his braces repaired, and noted that it had been two weeks since he was told he would have an appointment. (Doc. # 156-5 at 6; Docs. # 194-2/196-2 at 26.)

Defendants contend that Plaintiff was rescheduled for OrthoPro on December 8, 2011. (Doc. # 156-3 at 6.) A note from OrthoPro on this date says that the springs in Plaintiff's braces are broken and will be replaced. (*Id*.) Plaintiff disputes he saw them on this date (Docs. # 194/196 at 40-41); however, he submitted a copy of a December 8, 2011 appointment slip with OrthoPro with a note on it: "Rod sent out my braces for repair." (Docs. # 194-2/196-2 at 40.)

18

While Plaintiff may dispute being *seen* by OrthoPro on that date, he acknowledges his braces were sent out for repair.

On December 20, 2011, Plaintiff asked when his leg braces would be returned. (Docs. # 194-2/196-2 at 42.) In response he was told that he was seen by OrthoPro on December 26, 2011. (*Id.*) Plaintiff's notation on the form states he did not receive the repaired braces at that appointment. (*Id.*)

A December 28, 2011 progress note (with an OrthoPro notation so as to indicate it is from OrthoPro) states: "attempting to find replacement springs and ball, for existing AFD's. No luck. Still looking for the correct diameter springs to put in brace. Ankle joints are discontinued & not available at this time. I am attempting to locate a spring x4 for his braces. Will continue looking for spring to use on braces." (Doc. # 156-3 at 5.)

**iv. 2012-2013**

Defendants contend there were no further complaints in the progress notes concerning the braces between December 28, 2011 and March 29, 2012. (Doc. # 155 at 7.) However, Plaintiff provides evidence that he did send various kites and grievances regarding his leg braces in January and February. (Docs. # 194-2/196-2 at 43-44; Doc. # 194-3/196-3 at 5-7; Doc. # 194-2/196-2 at 45.)

Defendants state that it is not clear from the medical records when the braces were returned; however, Plaintiff indicates he got them back in February, but they still did not have the proper springs. (Docs. # 194/196 at 42.) This is supported by a kite he sent on February 10, 2012, where he stated that the leg braces were missing a screw and were not properly repaired. (Docs. # 194-3/196-3 at 1.) He asked OrthoPro to come back and was told: "come to sick call." (*Id.*)

Plaintiff sent additional kites about the leg braces needing to be repaired in May and June of 2012. (Docs. # 194-3/106-3 at 9-10.)

The next progress note to mention the leg braces is dated June 28, 2012, and indicates that both leg braces have "fallen into disrepair." (Doc. # 156-1 at 6.)

A note from OrthoPro dated July 25, 2012, indicated that Plaintiff was requesting various repairs of the braces, including that the ankle joints be riveted to the plastic, the padding be replaced and/or added, and a screw be replaced. (Doc. # 156-3 at 5.) Plaintiff also provides an appointment slip for OrthoPro with this date with a notation: "sent braces out for repair." (Docs. # 194-3/196-3 at 13.)

A subsequent note from OrthoPro dated August 30, 2012, indicates that OrthoPro was performing the repairs of the braces at no charge: "his braces are completely falling apart and I don't have the heart to charge what it would cost to fix them/repair them." (Doc. # 156-3 at 3.)

On September 11, 2012, Plaintiff sent a kite asking about the status of his braces which he said had been sent out for repair the prior month. (Docs. # 194-3/196-3 at 15.) He was told he would receive them back in a week or two. (*Id.*) A letter from OrthoPro dated September 24, 2012, states that they have sent the braces for Plaintiff with new padding/lining and velcro. (Doc. # 156-3 at 2.) With respect to the springs, the letter states: "I will need an auth for them as they are very expensive, the manufacturer does not make them anymore and I have to have them custom made. Code L2999-Dorsi-assist replacement springs. $85." (*Id.*)

A handwritten note on Plaintiff's September 11, 2012 kite indicates that Plaintiff received the braces back on September 26, 2012; however, the padding was wrong and there was no spring tension. (Docs. # 194-3/196-3 at 15.) The note also states that he could not wear the braces as they were improperly adjusted and digging into his heels and ankles. (*Id.*) Plaintiff sent a kite to this effect on September 27, 2012, stating that he could not wear the braces because they were causing him extreme pain. (Docs. # 194-3/196-3 at 17.)

According to Plaintiff, the braces were not sent back out for repair until November 8, 2012. (Docs. # 194-3/196-3 at 20.)

In a December 18, 2012 kite, Plaintiff asked for his braces to be repaired again because the springs were not functioning properly. (Docs. # 194-2/196-2 at 41.)

Plaintiff was paroled some time in December 2012, and came back to NNCC from

1    Washoe County Jail on May 17, 2013. (Doc. # 156-1 at 3.) It was noted at that time that he was

2    permitted to keep his leg braces, inserts and shoes. (Doc. # 156-2 at 3.) He submitted additional

3    kites in August 2013 where he complained that the braces were not functioning and needed

4    repairs. (Docs. # 194-3/196-3 at 23-24.) He claims this caused him to fall and injure himself

5    on August 12, 2013. (Docs. # 194/196 at 43.) The braces apparently went out for repair at some

6    point as Plaintiff sent another kite in October asking about their status. (Docs. # 194-3/196-3

7    at 25.)

8         Plaintiff maintains that from 2009 through 2013, he was never issued properly

9    functioning leg braces. (Docs. # 194/196 at 43.)

10                        **c. Conclusion**

11        As the court indicated above, Defendants do not dispute that Plaintiff required leg braces

12   for his condition or that they were frequently broken and in need of repair. Nor do Defendants

13   dispute that at one point NDOC gave its approval for Plaintiff to get new braces. However,

14   Defendants' own evidence and that presented by Plaintiff illustrates that each time the old

15   braces were repaired, Plaintiff complained that they repairs were inadequate and he continued

16   to suffer pain in trying to wear them. In addition, the record contains evidence that the new leg

17   braces suffered from their own host of problems. The court acknowledges that Defendants

18   frequently referred Plaintiff's complaints to their contractor, OrthoPro, and in doing so they

19   claim they did all they could to remedy Plaintiff's complaints. As such they contend that

20   Plaintiff's Eighth Amendment claim does not rise to the level of deliberate indifference, but

21   instead constitutes a difference of opinion regarding the course of conduct chosen by

22   Defendants. (*See* Doc. # 206 at 2, 7-8.)

23        The court, however, finds there is a genuine dispute of material fact exists as to whether

24   this course of conduct was medically unacceptable under the circumstances and in conscious

25   disregard of an excessive risk to Plaintiff's health. *See Snow*, 681 F.3d at 987-988 (citations

26   omitted).

27        Plaintiff came to NDOC in the summer of 2009 and it was acknowledged at that time

28

that he required leg braces, however, instructions were not given to his family to send the braces in until November 2009. The braces were sent in, and given to OrthoPro for repairs. Plaintiff takes issue with the fact that when the braces were first sent in, he was not allowed to go with them, implying that the maladjustment and successive repairs could have somehow been avoided if he had been fitted with the braces. Then, while Defendants claim that the braces were "working fine" in December 2009, Plaintiff claims the opposite was true, and in fact, he complained that they needed to be sent out for repair again.

Plaintiff continued to send kites requesting that the braces be repaired in early 2010. Defendants contend that he was seen by medical providers and prescribed Tylenol in response to his complaint, but Plaintiff disputes many of the occasions where Defendants state he was seen. In addition, it is not clear whether the prescription of Tylenol was sufficient to alleviate the pain he was experiencing.

Defendants also advance the argument that while the braces were being repaired, Plaintiff had his orthotics; however, on several occasions Plaintiff's kites and grievances reference the fact that his inserts were in desperate need of repair too. Therefore, there is an issue of fact regarding whether Plaintiff's medical needs were sufficiently satisfied by the use of orthotics when his braces were being repaired.

While it cannot be disputed that Defendants referred Plaintiff's complaints regarding the need for repairs to his braces to OrthoPro on many occasions, Plaintiff contends, and produces evidence to support his position, that the repairs were never satisfactory and caused Plaintiff  pain as a result. Moreover, there is evidence that even other NDOC employees recognized that the braces were in a state of disrepair, yet the only action taken was continued referral to the same contractor. For example, when Plaintiff was at LCC in March 2010, there is a statement attributed to Dr. Scott and/or Don Poag that "[t]he brace is obviously poor fitted…" (Doc. # 156-3 at 12.)

Despite this statement, Defendants concede that the braces were still not properly fixed when Plaintiff inquired about them later that month. (Doc. # 155 at 4.) When Plaintiff was sent

1  back to WSCC in June 2010, the issues remained unresolved, and Plaintiff contends that he

2  continued to complain about the problem.

3      NNCC decided to consider having new braces made for Plaintiff in July 2010; however,

4  Plaintiff maintains that he did not even receive them until November 2010, and they were

5  unwearable. He states that he could not have them on for more than five minutes and when he

6  took them off his feet would be soaked in blood.

7      Defendants are correct that there are no documented issues in Plaintiff's medical records

8  concerning the braces while Plaintiff was at NNRC from February through June 2011; however,

9  the complaints resumed when Plaintiff came back to NNCC.

10     Defendants acknowledge that as of November 2011 Plaintiff had complained that the

11 new braces were causing him considerable pain and the old braces had springs that did not

12 properly function. Defendants claim that in response they scheduled Plaintiff to be seen by

13 OrthoPro, but he was a "no-show." Plaintiff disputes this, stating that he was never made aware

14 of the appointment. Plaintiff acknowledges the braces were eventually sent out for repair on

15 December 8, 2011. Plaintiff continued to kite about the braces in early 2012, and finally got

16 them back in February 2012, but claims they did not have the proper springs.

17     Plaintiff filed additional complaints in March and June 2012. In June 2012, a progress

18 note entry in Plaintiff's medical file acknowledges that the leg braces "have fallen into

19 disrepair." (Doc. # 156-1 at 6.) In addition, when OrthoPro subsequently received the braces

20 to conduct repairs, they acknowledge they had "completely fallen apart." (Doc. # 156-3 at 3.)

21     After Plaintiff got the braces back in September, they still did not have repaired springs,

22 and Plaintiff claims they were not properly adjusted. They were not sent back for repairs until

23 November, and Plaintiff got them back in December, but contends they were still not

24 functioning properly. He was paroled some time in December 2012, but returned to NDOC in

25 May 2013, and the complaints regarding repairs persisted.

26     In light of this evidence, the court finds that a genuine dispute exists as to whether

27 something more should have been done under the circumstances, and whether the failure to

28

do so was medically unacceptable in disregard of an excessive risk to Plaintiff's health. This dispute requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. (citations and quotation marks omitted).

In sum, Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim that they were deliberately indifferent to his serious medical need should be denied as to defendants Dr. Bannister, Dr. Gedney, Dr. Johns, Kathy King, Dr. Mar, Jack Palmer, John Peery, and Veronica VanHorn.

**C. Official Capacity Damages**

"[F]ederal courts are barred by the Eleventh Amendment from awarding damages against state officials acting in their official capacities[.]" *Snow v. McDaniel*, 681 F.3d 978, 991 (9th Cir. 2012) (citing *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003)).

Accordingly, it should be ordered that Plaintiff's claim for damages against any defendant in his or her official capacity be dismissed.

**D. Defendants Perry & Walsh**

Plaintiff's claim against defendant Perry is that he acted with deliberate indifference when he refused to transfer Plaintiff to a hospital for stitches following a fall on October 16, 2010. (Doc. # 11 at 5.)

Plaintiff opposes this request, arguing that defendant Perry refused to follow policies that required him to be taken to the emergency room for stitches and denied him proper emergency medical care and this is relevant to his leg braces claim, and because that fall occurred as a result of Defendants deliberate indifference concerning the leg braces. (Docs. # 194/196 at 54, # 194-1/196-1 at 1.)

The claim related to the fall has been dismissed because Plaintiff failed to exhaust his administrative remedies. (*See* Docs. # 108, # 136.) While Plaintiff tries to tie that claim into the claim involving the leg braces, they are separate claims. If Plaintiff exhausts his administrative remedies and brings an action for that incident, he can assert his claim against defendant Perry. However, defendant Perry should be dismissed from *this* action.

Plaintiff's claim against defendant Walsh is that she transferred him to a unit far from the medical buildings, allegedly in retaliation for Plaintiff's filing of medical kites and grievances. (Doc. # 11 at 6, 8.)

The court also dismissed Plaintiff's retaliation claim for failure to exhaust administrative remedies. (Docs. # 108, # 136.) Plaintiff does not appear to dispute that she is no longer a proper defendant in this case. Accordingly, defendant Walsh should be dismissed from this action.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order that:

(1) Plaintiff's request for any extension of time to respond to Defendants' motion or continuance of this matter be **DENIED**;

(2) Plaintiff's motion for summary judgment (Doc. # 196) be **DENIED**;

(3) Defendants' motion for summary judgment (Doc. # 155) should be **DENIED** as to defendants Dr. Bannister, Dr. Gedney, Dr. Johns, Kathy King, Dr. Mar, Jack Palmer, John Peery, and Veronica VanHorn;

(4) Defendants' motion for summary judgment should be **GRANTED** as to Defendants Jonathan Perry and Elizabeth Walsh; and

(5) Any claim for damages against a defendant in his or her official capacity should be **DISMISSED**.

///
///
///
///
///
///
///
///

The parties should be aware of the following:

1.      That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

**DATED: January 30, 2014.**

_____
**WILLIAM G.  COBB**
**UNITED STATES MAGISTRATE JUDGE**

26